**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| JUPITER ALUMINUM CORPORATION, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 2:16-cv-30 |
| | ) |
| PHILIP J. SABAITIS; LOREN D. JAHN; SCRAP | ) |
| METAL SERVICES, LLC; MICHAEL L. | ) |
| THOMPSON; GMI SERVICES LLC D/B/A GMI | ) |
| RECYCLING SERVICES, INC.;  and GARY S. | ) |
| LONGORIA, | ) |
| Defendants. | ) |
| | ) |
| | ) |

**COMPLAINT**

Plaintiff Jupiter Aluminum Corporation complains against Defendants Philip J. Sabaitis,

Loren D. Jahn, Scrap Metal Services, LLC, Michael L. Thompson, GMI Services LLC d/b/a GMI

Recycling Services, Inc. and Gary S. Longoria, as follows:

**NATURE OF THE CASE**

1.      Jupiter Aluminum Corporation ("Jupiter") recycles scrap aluminum that it purchases

from various vendors and processes into recycled coils.  This lawsuit arises out of a wide-ranging

conspiracy orchestrated by Defendants to defraud Jupiter through its purchases of scrap aluminum.

2.      During an audit of Jupiter's fiscal year 2014 ("FY2014") closing, Jupiter's accountants

identified a discrepancy in Jupiter's scrap inventory.  By comparing the amount of scrap Jupiter

purchased with the amount consumed during its recycling process, which amounts should be nearly

identical, Jupiter's accountants determined that it paid for 8.82 million pounds of scrap that it never

processed into recycled coils.

3. Jupiter had paid its scrap metal vendors $8,048,228 for the missing scrap inventory.

4. Jupiter has since determined that its former Receiving/Inventory Supervisor (Philip Sabaitis) and CFO (Loren Jahn) surreptitiously conspired over a substantial period of time with certain of Jupiter's vendors and their employees, namely Scrap Metal Services, LLC ("SMS") and its former senior manager, Michael L. Thompson, and GMI Services LLC d/b/a GMI Recycling Services, Inc. ("GMI") and its owner, Gary S. Longoria, to submit falsified paperwork that caused Jupiter to pay for: (1) scrap shipments that Jupiter never received, and (2) scrap that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

## JURISDICTION AND VENUE

5. Jupiter seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C § 1961 *et seq*. This Court has subject matter jurisdiction over these federal claims pursuant to 18 U.S.C. § 1964(a) and (c) and 28 U.S.C. § 1331.

6. Jupiter also seeks relief under Indiana law, including Indiana Code § 35-45-6-2 (RICO), Indiana Code § 35-43-4-3 (Criminal Conversion), Indiana Code §35-43-5-3 (Deception) and Indiana common law claims (Fraud, Civil Conspiracy, Breach of Contract, Unjust Enrichment) that arise out of a common nucleus of operative facts shared with the federal RICO claims, over which this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over each of the Defendants under Rule 4(k) of the Federal Rules of Civil Procedure, Indiana Trial Rule 4.4 and 18 U.S.C. § 1965 because each Defendant: (1) resides in, is found in, has an agent in, and/or transacts his or its affairs in this District; or (2) contracts or has contracted to supply goods or services within Indiana or this District; or (3) has committed a tortious act within Indiana or this District; or (4) the ends of justice require that Defendants residing in any other district be brought before this Court.

8.     Venue is proper in this judicial district pursuant to 18. U.S.C. § 1965 and 28 U.S.C. § 1391 because each Defendant resides in, is found in, has an agent in, and/or transacts his or its affairs in this District, and because a substantial part of the events or omissions giving rise to Jupiter's claims occurred in this District.

## PARTIES

9.     Jupiter  was purchased by its current ownership in 1992.  It is a privately-held Indiana corporation with its principal place of business in Hammond, Indiana.  By FY2014, Jupiter had approximately 350 full time employees and processed approximately 200 million pounds of scrap into recycled aluminum coils.

10.     Philip J. Sabaitis resides in Lowell, Indiana.  Sabaitis was employed by Jupiter from 1999 through January 2015, and was Jupiter's Receiving/Inventory Supervisor beginning in 2009.

11.     Loren D. Jahn resides in Palos Park, Illinois.  Jahn was Jupiter's Chief Financial Officer from 2007 through December 2014.

12.     SMS is an Illinois limited liability company with its principal place of business in Burnham, Illinois.  Beginning in 2005, SMS sold scrap metal to Jupiter.

13.     Michael L. Thompson resides in Dyer, Indiana.  During the relevant time period, Thompson was a senior manager at SMS and held the title of Vice President Intermodal.  Thompson also had a partial ownership interest in SMS.

14.     GMI is an Indiana limited liability company with its principal place of business in Crown Point, Indiana.  Between 2011 and October 2014, GMI sold scrap metal to Jupiter.

15.     Gary S. Longoria resides in Crown Point, Indiana.  During the relevant time period, Longoria was the owner of GMI.  On information and belief, Longoria is a childhood friend of Sabaitis.

## FACTUAL BACKGROUND

16.    Paragraphs 17 to 19 below describe Jupiter's typical process for purchasing, receiving and paying for scrap metal.  As shown in paragraphs 20 to 76 below, Sabaitis and Jahn, in conjunction with SMS, Thompson, GMI and Longoria, deviated from this process when they conspired to steal from Jupiter.

## JUPITER'S TYPICAL PROCESS FOR PURCHASING AND RECEIVING SCRAP METAL

**Jupiter Negotiates And Purchases Scrap Aluminum From Vendors**

17.    Jupiter typically negotiates the purchase of scrap from its vendors as follows:

A.    Each business day, Jupiter determines the price at which it is willing to purchase various types of scrap aluminum that day.

B.    Jupiter then sends an email to a list of vendors specifying the type and quantity of scrap Jupiter seeks to purchase and at what price, and the vendors respond by phone or email.

C.    Once Jupiter and the vendor reach an agreement regarding the type, quantity and price of the scrap to be delivered, Jupiter notes the transaction on a quote sheet that contains a purchase order ("P.O.") number, which Jupiter provides to the vendor that day via email or by phone.

D.    The information from the quote sheet is then entered into Jupiter's computer program called Axiom, which generates a printed P.O. for each transaction that contains, among other information, the name of the vendor, the type and quantity of the scrap metal, the price, the date by which delivery is to be made and the terms and conditions governing the transaction.

E.    The original P.O. is sent to the vendor on either the same day that the order is received or the following business day, and a copy is retained by Jupiter.

**Vendors Deliver Shipments To Jupiter Through The Guard Gate**

18.    Once Jupiter agrees to purchase scrap from a vendor, the vendor typically delivers it to Jupiter as follows:

A.    After Jupiter issues the P.O., the vendor schedules a time for delivery with Jupiter's Receiving Department.  All trucks entering Jupiter's facility must pass through a

4

guard gate, which is manned continuously, 24 hours a day, seven days a week, by SDG Global, Inc. ("SDG"), which is unaffiliated with Jupiter.

B.      For each truck entering the facility, SDG's personnel record the trucking carrier, the name of the driver and the time of arrival and departure.  The guard gate personnel do not record any information regarding the contents of the trailer.

C.      On the date of delivery, the truck first passes through the guard gate and then proceeds to Jupiter's receiving office.  As Jupiter's Receiving/Inventory Supervisor, Sabaitis had supervisory authority over receiving and documenting incoming shipments after they passed through the guard gate.

D.      After passing though the guard gate and entering Jupiter's facility, the truck driver is instructed to drive to a scale, where the gross (full) weight of the trailer is recorded. The scrap metal in the trailer is then unloaded by Jupiter employees, and the truck is returned to the scale so that the tare (empty) weight of the trailer can be recorded.

E.      Thereafter, Jupiter issues a receiving ticket that provides, among other information, the gross weight of the trailer, the tare weight of the trailer, the net weight of the scrap, a description of the scrap, the P.O. number and the name of the vendor.

F.      The driver also typically provides a bill of lading that serves as a record of, among other things, the type and quantity of the scrap that was in the truck when it left the carrier's facility, and Jupiter's Receiving/Inventory Supervisor (Sabaitis, during all relevant times) signs the bill of lading, acknowledging receipt of the shipment.

**Transaction Packets Are Submitted And Scrap Vendors Are Paid**

19.   After Jupiter receives the scrap from the vendor, Jupiter typically pays the vendor as

follows:

A.      Once Jupiter issues the receiving ticket, its Receiving/Inventory Supervisor (Sabaitis) compiles a transaction packet, which includes, among other things, a copy of the P.O., the receiving ticket and the signed bill of lading.  The Receiving/Inventory Supervisor then submits the transaction packet to Jupiter's Scrap Purchasing Department, which approves payment to the vendor.

B.      Jupiter then issues a check to the scrap vendor that is signed by Jupiter's CFO (Loren Jahn, during all relevant times), and the check is subsequently mailed to the scrap vendor within 30 days of delivery of the scrap.

## THE SCHEME TO DEFRAUD JUPITER

20.   Prior to FY2014, Sabaitis, Jahn, Thompson, SMS, Longoria and GMI entered into a scheme to defraud Jupiter by manipulating and falsifying documentation to ensure that Jupiter paid for scrap it never received and scrap it received but never processed.

### Sabaitis's Unusual Relationship With Michael Thompson

21.   During the relevant time period, Thompson was SMS's primary contact with Jupiter, and SMS became one of Jupiter's highest volume scrap vendors during Thompson's tenure at SMS.

22.   Sabaitis's dealings with  SMS and Thompson were different than with other vendors. For instance, Thompson appeared at Jupiter's facility frequently, often once or twice per week, which was unique for someone in his position and unlike any other vendor's contact person with Jupiter.

23.   SMS's drivers sometimes would not deliver scrap to Jupiter and would actually turn around before entering Jupiter's facility if Sabaitis was not present when the truck arrived, which was unlike any other vendor.

24.   Sabaitis also filled out the bills of lading for SMS shipments, which is highly unusual. Indeed, SMS is the only vendor for which Sabaitis did this; all other vendors provided bills of lading filled out by them, their carrier or third-parties with whom they sub-contracted, which Sabaitis subsequently signed to acknowledge receipt at Jupiter's facility.

25.   These SMS bills of lading created by Sabaitis frequently only included Sabaitis's signature, the P.O. number and the vendor name "SMS," but they did not contain other information typically included on a bill of lading, such as the weight and a description of the scrap being delivered.

6

26.    For these shipments, SMS was paid for the weights indicated on Jupiter's receiving ticket, which is peculiar because a vendor typically would not choose to rely solely on the buyer's weight records without having its own record on its bill of lading.

27.    Furthermore, some of SMS's shipments did not have corresponding receiving tickets at all.  Instead, Sabaitis submitted internal paperwork based solely on the P.O. and the bill of lading he created.  This caused Jupiter to pay SMS based on how much scrap was ordered, with no record of how much scrap, if any, was actually delivered.

28.    This scenario made it possible for Sabaitis, in conjunction with Thompson and SMS's drivers, one of whom was Thompson's brother, Robert Thompson, to manipulate documentation to ensure that SMS was paid for scrap that Jupiter never received.

**Gary Longoria and GMI's Involvement In The Fraudulent Scheme**

29.    On information and belief, GMI is not in the business of purchasing or selling scrap metal.

30.    Rather, GMI is in the trash hauling industry.  In fact, on Sabaitis's recommendation, GMI was retained by Jupiter in 2014 to provide trash hauling services to Jupiter.

31.    Nonetheless, GMI began selling scrap metal to Jupiter in Jupiter's fiscal year 2011. That year, Jupiter paid for less than 400,000 pounds of scrap from GMI, which made GMI the 72nd-largest scrap vendor to Jupiter by volume.  By FY2014, however, Jupiter paid GMI for nearly 15 million pounds of scrap, which made it Jupiter's second-largest scrap vendor by volume.

**Jahn, Sabaitis, Thompson And Longoria All Mislead Jupiter**

Jahn Lied To Jupiter

32.    In or around February 2014, Jupiter's President questioned Jahn about a significant inventory discrepancy and directed Jahn to investigate it.  About a month later, Jahn reported that he

had resolved the inventory discrepancy, which was not true.  As a result, the inventory discrepancy became a much larger problem, of which Jupiter was unaware until the audit of Jupiter's FY2014 closing in July 2014 conducted by Jupiter's independent public accountants.

33.   Jahn also lied to Jupiter's management about whether bronze nuts and bolts (unrelated to the inventory discrepancy) had been sold by Jupiter or stolen.

34.   Jahn also engaged in self-dealing by directing other Jupiter personnel to allow him to purchase assets from Jupiter without seeking authorization from upper management.

35.   Jahn was terminated as CFO of Jupiter in December 2014, but worked as a part-time consultant for Jupiter until March 2015.

36.   In March 2015, Jahn submitted to a polygraph examination, which he failed. Specifically, the polygraph results indicated that Jahn was not truthful when he asserted that:  (1) he did not have knowledge or involvement in the misappropriation of Jupiter's assets; (2) he did not participate in any cover-up; and (3) he never received any kickbacks or other benefits as a result of his relationship with Jupiter's vendors.

37.   Since taking the polygraph examination, Jahn has refused to cooperate with Jupiter's inquiry into the inventory shortfall.

Sabaitis lied to Jupiter

38.   Sabaitis was questioned about the inventory shortfall by Jupiter on six separate occasions, and he frequently provided inconsistent and incorrect statements.

39.   For instance, when questioned about the lack of receiving tickets for certain SMS shipments, Sabaitis stated that in 2013 the primary scale used by Jupiter for weighing incoming shipments was often broken.  This was false.

40.    Sabaitis further stated that the primary scale was inoperable for a period of three weeks during September 2013, during which time no incoming shipments were weighed.  This also was false.

41.    In December 2014, Sabaitis agreed to take a polygraph test.  Soon thereafter, however, Sabaitis suddenly resigned from Jupiter, where he had worked for more than 15 years, the last six of which as Jupiter's Receiving/Inventory Supervisor.  Sabaitis's criminal defense counsel subsequently informed Jupiter that Sabaitis would not take the polygraph test or cooperate with Jupiter's inquiry.

42.    In March 2015, Sabaitis opened a restaurant called Phat Phil's Sandwich Shop in Crown Point, Indiana, and Sabaitis claimed that he received an inheritance from his parents that gave him the financial ability to open Phat Phil's.  Jupiter has searched for but not located any public records reflecting any such inheritance.

<u>Thompson and SMS Refused To Cooperate with Jupiter</u>

43.    On March 18, 2015, Jupiter questioned Thompson about SMS's role in the inventory shortfall and his relationship with Sabaitis.

44.    Thompson appeared nervous and requested to see Jupiter's questions in advance.  Once that request was granted, Thompson stated that he wanted to review the questions for several days before answering them.

45.    Thompson steadfastly refused to answer any questions on March 18, 2015.  However, later that day, Thompson requested that Jupiter's General Counsel meet with Thompson and Thompson's criminal defense attorney.

46.    When Jupiter's General Counsel arrived at Thompson's attorney's office for the requested meeting, however, Thompson's attorney informed him that Thompson would not be

present and that Thompson would not answer further questions due to concerns about self-incrimination.

47.    Shortly thereafter, Thompson's employment with SMS ended.  Since then, Thompson's criminal defense counsel informed Jupiter that Thompson would not cooperate with Jupiter's inquiry.  Likewise, SMS's criminal defense counsel informed Jupiter that SMS would not make its drivers available for questioning or allow Jupiter to copy certain of its records relating to the "ghost truck" shipments discussed below.

48.    Thompson subsequently has been reemployed by SMS and works for SMS currently.

<u>Longoria Lied to Jupiter And GMI Suddenly Stopped Delivering Scrap</u>

49.    As noted above, GMI sold nearly 15 million pounds of scrap to Jupiter in FY2014, which made it Jupiter's second-largest scrap vendor by volume.

50.    GMI abruptly stopped delivering scrap metal to Jupiter in October 2014, which is contemporaneous with when Jupiter first questioned Sabaitis regarding the inventory shortfall.

51.    In fact, there remains an open P.O. for scrap metal that GMI has never completed. When Jupiter questioned Longoria about this open P.O., Longoria falsely claimed that one of Jupiter's other vendors, Metal Exchange, gave GMI a higher price for the scrap and that Metal Exchange subsequently resold that scrap to Jupiter, which is why GMI did not provide the scrap required by the open P.O. to Jupiter.  In reality, GMI sold no scrap to Metal Exchange at any time relevant hereto.

**THE DEFENDANTS DEFRAUDED JUPITER**

52.    Sabaitis and Jahn used their positions within Jupiter to defraud Jupiter by falsifying and manipulating paperwork that caused Jupiter to pay vendors for scrap that Jupiter never received (the

"ghost truck" scam) and for scrap that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it (the "scrap removal" scam).

53.    SMS, Thompson, GMI and Longoria conspired with Sabaitis and Jahn to effectuate both the "ghost truck" scam and the "scrap removal" scam.  Without their involvement, neither scam would have been possible.

**The "Ghost Truck" Scam**

54.    After Jupiter became aware of the inventory shortfall, it compared SDG's guard gate logs to Jupiter's paperwork and found numerous instances where a vendor was paid for a "shipment" but the guard gate log did not reflect a corresponding truck entering Jupiter's facility.

55.    To reconcile these "shipments," Jupiter requested that its vendors provide information regarding the identities of the carriers and drivers of these apparent "ghost trucks," because shipments are sometimes delivered by third-party trucking companies or third-party subcontractors whose names will appear on the guard gate logs instead of the vendor.

56.    Some of the vendors responded and provided all of the requested information, some provided some of the requested information, some refused to provide any information and some did not respond to Jupiter's request at all.

57.    Using the information provided by the vendors, Jupiter was able to reconcile certain shipments where the carrier and/or driver associated with the shipment appeared on the guard gate log.

58.    However, 95 trucks from 20 different vendors are unreconciled on SDG's guard gate logs; that is, these 95 "ghost trucks" never arrived at Jupiter's facility.  Attached hereto as Exhibit 1 is a spreadsheet providing details for each of these "ghost truck" shipments.

59. SMS provided information regarding the carriers and drivers of its shipments. Nonetheless, SMS was paid for 26 "ghost truck" shipments (totaling $507,566) that do not appear on SDG's guard gate logs. (*See* Ex. 1.)

60. GMI provided information regarding the carriers and drivers of its shipments. Nonetheless, GMI was paid for two "ghost truck" shipments (totaling $55,148) that do not appear on SDG's guard gate logs. (*See* Ex. 1.)

61. For almost all of these "ghost trucks," the bill of lading provided by the driver was signed by Sabaitis. Likewise, Jupiter's receiving ticket and other shipment documentation was under Sabaitis's control as Receiving/Inventory Supervisor.

62. On information and belief, Sabaitis, Jahn, Thompson, SMS, Longoria and GMI conspired to divert the "ghost truck" shipments and sell the scrap back to Jupiter or to third parties for their own personal gain. As noted above, SMS has refused Jupiter's request to interview SMS's drivers, one of whom was Thompson's brother, regarding where the "ghost truck" shipments were diverted.

63. On information and belief, Thompson and/or Longoria subsequently provided the bills of lading for the "ghost truck" shipments to Sabaitis.

64. Sabaitis then submitted those bills of lading, along with the other necessary falsified documentation corresponding to these "ghost truck" shipments, to Jupiter's Scrap Purchasing Department for payment.

65. Jahn subsequently approved the payments for the "ghost truck" shipments and signed and mailed the corresponding checks to the vendors, which caused Jupiter to pay more than $2.48 million for scrap shipments that Jupiter never received.

**The "Scrap Removal" Scam**

66.    After accounting for the losses attributable to the "ghost truck" scam, Jupiter still has more than $5.56 million in unaccounted inventory losses for FY2014.

67.    These additional losses are attributable to scrap metal that arrived on trucks that passed through Jupiter's guard gate but was subsequently removed from Jupiter's facility by the Defendants before Jupiter processed it into recycled aluminum coils.

68.    On information and belief, Sabaitis, Jahn, Thompson, SMS, Longoria and GMI conspired to defraud Jupiter by removing scrap that had been delivered to Jupiter and selling it back to Jupiter or to third parties for their own personal gain.

69.    Sabaitis's and Jahn's managerial positions and authority within Jupiter's operations afforded them the opportunity to conspire to remove Jupiter's scrap metal before it could be processed and conceal such fraudulent conduct in many different ways.  One such possible scam involved using trailers that were dropped at Jupiter by SMS and another vendor, as described in paragraphs 70 to 77 below.

<u>Sabaitis Arranged For SMS to Drop Trailers At Jupiter</u>

70.    Metal Exchange Corporation has been Jupiter's largest volume scrap aluminum supplier every year since at least 2000.  Prior to when Sabaitis started working at Jupiter in 1999, Jupiter's upper management approved an arrangement for Metal Exchange's drivers to drop off trailers for later unloading by Jupiter.  Accordingly, the drivers for those Metal Exchange shipments simply would drop the trailer off and leave Jupiter's facility in their cab, and Jupiter would later weigh and unload the shipment on its own, thereby saving the drivers time.

71.    In or around 2011, Sabaitis personally provided SMS the same arrangement.  Sabaitis's arrangement with SMS was not known to his superiors or upper management, nor did Sabaitis seek their approval.

72.    Metal Exchange and SMS were the only two vendors that dropped off trailers for later unloading by Jupiter.

73.    The dropped trailers generally do not have locks on the trailer doors, which made possible undetected loading or unloading of the trailers.

74.    Accordingly, there was opportunity for Sabaitis, in conjunction with Jahn, Thompson, SMS, Longoria, GMI and their drivers to use the dropped trailers to defraud Jupiter.

75.    For instance, any of the following scams could have been orchestrated using the SMS and Metal Exchange trailers dropped at Jupiter's facility:

A.    A full trailer is weighed, then the driver unlatches his cab from the full trailer and latches on to one of the empty trailers left behind by SMS or Metal Exchange.  The empty trailer is then weighed and a receiving ticket is produced by Sabaitis.  The driver then unlatches his cab from the empty trailer and reattaches the cab to the full trailer, which the driver then takes to another scrap yard where the scrap is deposited.  Nonetheless, Sabaitis submits the falsified paperwork to Jupiter and the vendor is paid as if the scrap were delivered to Jupiter;

B.    A dropped trailer is weighed full at Jupiter and then driven full to another scrap yard where the scrap is deposited.  The empty truck then returns to Jupiter, at which time the empty trailer is weighed and a receiving ticket is produced, which Sabaitis submits to cause Jupiter to pay for the scrap even though that scrap was not left at Jupiter's facility; or

C.    The dropped trailer is weighed and unloaded properly by Jupiter employees and the receiving ticket is produced, causing Jupiter to pay for the scrap that was delivered.  Later, the empty trailer is re-filled with scrap from Jupiter's yard after hours or on weekends and delivered to another scrap yard.  Thus, Jupiter appropriately paid the vendor for the scrap, but it did not process that scrap before it was removed and delivered to another yard.

76.    Notably, GMI first began selling scrap to Jupiter in 2011, which corresponds with when Sabaitis began allowing SMS to drop trailers at Jupiter's facility.

77.   Because of Sabaitis's, Jahn's and Thompson's refusal to cooperate with Jupiter's inquiry, and SMS's refusal to make its drivers (including Thompson's brother) available for questioning, Jupiter has been unable to confirm definitively which, if any, of these ploys (or any others) the Defendants used to facilitate their "scrap removal" scam.

### COUNT I
### Federal RICO § 1962(c)
### (Sabaitis, Jahn)

78.   Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

79.   This Count is asserted against Sabaitis and Jahn, each of whom is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c).

80.   Jupiter constitutes an "enterprise" within the meaning of 18 U.S.C. 1961(f) and 1962(c). At all times relevant hereto, Sabaitis and Jahn were employees of Jupiter.

81.   By purchasing scrap from vendors in numerous states and selling recycled aluminum coils to customers in numerous states, Jupiter is engaged in interstate commerce and its activities affect interstate commerce.

82.   Sabaitis and Jahn agreed to and knowingly did conduct and participate in the conduct of Jupiter's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Jupiter by causing Jupiter to pay for:  (1) scrap metal that Jupiter never received, and (2) scrap metal that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

83.   Pursuant to and in furtherance of their fraudulent scheme, Sabaitis and Jahn utilized wire services and U.S. mail with the intent to defraud in the following ways:

        a.      Every day, Jupiter exchanged emails with its vendors regarding the price at which Jupiter was willing to purchase scrap that day.  Once a purchase was

agreed upon by Jupiter and a vendor, Jupiter sent confirmation of that order to the vendor by email or phone and later sent a printed P.O for that order to the vendor through the U.S. mail or by email.  Without the purchase being negotiated and the P.O. being sent to the vendors, the scrap on each of the 95 "ghost trucks" would not have been shipped to Jupiter, and Sabaitis, Jahn and their co-conspirators would not have been able to execute their fraudulent scheme;

b.      Within 30 days of when the falsified documentation for each of the 95 "ghost truck" shipments was submitted to Jupiter's Scrap Purchasing Department by Sabaitis and approved by Jahn, Jupiter mailed a check via U.S. mail to the corresponding vendor for payment of the shipment that was diverted from Jupiter.  Without those payments being made, Sabaitis, Jahn and their co-conspirators would not have been able to execute their fraudulent "ghost truck" scam;

c.      Sabaitis likewise submitted falsified paperwork for shipments of scrap metal that were delivered to Jupiter but that Sabaitis knew would not be retained at Jupiter's facility or used for Jupiter's benefit.  Using that falsified paperwork, Jahn approved those transactions, and Jupiter mailed a check via U.S. mail to the corresponding vendor.  Without those payments being made, Sabaitis, Jahn and their co-conspirators would not have been able to execute their fraudulent "scrap removal" scam.

84.    Sabaitis's and Jahn's intentional use of the wires and U.S. mail to execute their fraudulent scheme constitutes wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341.

85.    The wire fraud and mail fraud acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

86.    Sabaitis and Jahn have directly and indirectly conducted and participated in the conduct of Jupiter's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

87.    Sabaitis and Jahn have knowingly and intentionally acquired or maintained proceeds belonging to Jupiter directly or indirectly through this pattern of racketeering activity.

88.    As a direct and proximate result of Sabaitis's and Jahn's racketeering activities and violations of 18 U.S.C. § 1962(c), Jupiter has been injured in its business and property in that Jupiter paid more than $8 million in FY2014 for:  (1) scrap that it never received, and (2) scrap that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against Sabaitis and Jahn on Count I and provide the following relief to Jupiter:

a.    General damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

b.    Jupiter's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c); and

c.    Such other and further relief as this Court deems appropriate.

17

### COUNT II
### Federal RICO § 1962(d)
### (All Defendants)

89.     Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

90.     This Count is asserted against each of the Defendants, each of whom is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c).

91.     Jupiter constitutes an "enterprise" within the meaning of 18 U.S.C. 1961(f) and 1962(c).

92.     By purchasing scrap from vendors in numerous states and selling recycled aluminum coils to customers in numerous states, Jupiter is engaged in interstate commerce and its activities affect interstate commerce.

93.     As set forth above, the Defendants have knowingly and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of Jupiter through a pattern of racketeering activity.  The Defendants knew that the predicate acts of wire fraud and mail fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to further the "ghost truck" and "scrap removal" scams described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C § 1962(d).

94.     Each of the Defendants has knowingly and intentionally acquired or maintained proceeds belonging to Jupiter directly or indirectly through this pattern of racketeering activity.

95.     As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Jupiter has been injured in its business and property in that Jupiter paid more than $8 million in FY2014 for:  (1) scrap metal that it never received, and (2) scrap metal that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against each of the Defendants on Count II and provide the following relief to Jupiter:

     a.     General damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

     b.     Jupiter's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c); and

     c.     Such other and further relief as this Court deems appropriate.

### COUNT III
### Indiana RICO
### Violation of Indiana Code § 35-45-6-2
### (Sabaitis, Jahn)

96.    Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

97.    This Count is asserted against Sabaitis and Jahn, each of whom is a "person" within the meaning of Indiana Code § 35-45-6-2.

98.    Jupiter constitutes an "enterprise" as that term is used in Indiana Code § 35-45-6-1.  At all times relevant hereto, Sabaitis and Jahn were employees of Jupiter.

99.    Sabaitis and Jahn agreed to and did knowingly conduct and participate in the conduct of Jupiter's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Jupiter by causing Jupiter to pay for:  (1) scrap metal that Jupiter never received, and (2) scrap metal that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

100.    Pursuant to and in furtherance of their fraudulent scheme, Sabaitis and Jahn committed or conspired to commit numerous acts of theft, which included:

    a.      diverting the 95 "ghost truck" shipments and selling the scrap that rightfully belonged to Jupiter back to Jupiter or to other third parties for their own personal gain;

    b.      removing scrap that had been delivered to Jupiter and selling it back to Jupiter or to other third parties for their own personal gain.

101.  Sabaitis's and Jahn's knowing and intentional exertion of unauthorized control over property and money of Jupiter with the intent to deprive Jupiter of its value and use violated Indiana Code § 35-43-4-2.

102.  Collectively, these acts of theft constitute a pattern of racketeering activity within the meaning of Ind. Code § 35-45-6-1 in that they were performed with the same intent, result, accomplice, victim or method of commission or are otherwise related by distinguishing characteristics and are not isolated events.

103.  Sabaitis and Jahn have directly and indirectly conducted and participated in the conduct of Jupiter's affairs through the pattern of racketeering activity described above, in violation of Ind. Code § 35-45-6-2(c).

104.  Sabaitis and Jahn have knowingly and intentionally acquired or maintained proceeds belonging to Jupiter directly or indirectly through this pattern of racketeering activity.

105.  As a direct and proximate result of Sabaitis's and Jahn's racketeering activities and violations of Ind. Code § 35-45-6-2(c), Jupiter has been injured in its business and property in that Jupiter paid more than $8 million in FY2014 for:  (1) scrap metal that it never received, and (2) scrap metal that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against Sabaitis and Jahn on Count III and provide the following relief to Jupiter:

    a.      General damages according to proof at trial, trebled according to statute, Ind. Code § 34-24-2-6(b);

    b.      Jupiter's reasonable attorneys' fees and costs according to statute, Ind. Code § 34-24-2-6(b);

    c.      Any punitive damages awarded by the court and allowable under the law according to statute, Ind. Code § 34-24-2-6(b); and

    d.      Such other and further relief as this Court deems appropriate.

### COUNT IV
### Indiana Common Law Fraud
### (Sabaitis, Jahn)

106.  Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

107.  Sabaitis knowingly and intentionally made false and misleading representations to Jupiter when he submitted transaction packets relating to the 95 "ghost truck" shipments, which Sabaitis knew had not been delivered to Jupiter.  (*See* Ex. 1.)   That falsified documentation included, but is not limited to:

    a.      bills of lading signed by Sabaitis for shipments of scrap metal that Sabaitis knew were not delivered to Jupiter, as reflected on Ex. 1;

    b.      receiving tickets created by Sabaitis for shipments of scrap metal that Sabaitis knew were not delivered to Jupiter, as reflected on Ex. 1;

    c.      copies of P.O.'s that were submitted by Sabaitis for shipments of scrap metal that Sabaitis knew were not delivered to Jupiter, as reflected on Ex. 1;

108.  Similarly, Jahn knowingly and intentionally made false and misleading representations to Jupiter when he approved payment and signed and mailed checks to vendors for the 95 "ghost truck" shipments, which Jahn knew had not been delivered to Jupiter.  (*See* Ex. 1.)

109.  Jupiter reasonably relied on Sabaitis's and Jahn's misrepresentations when it made payments to the vendors within 30 days of the date when the "ghost truck" shipments purportedly were delivered to Jupiter, as reflected on Ex. 1.

110.  Sabaitis further knowingly and intentionally made false and misleading representations to Jupiter when he submitted falsified transaction packets relating to scrap metal that Jupiter received but that the Defendants caused to be removed from Jupiter's facility before Jupiter processed it into recycled aluminum.  That falsified documentation included, but is not limited to:

      a.     falsified bills of lading created by Sabaitis for SMS shipments;

      b.     bills of lading signed by Sabaitis for shipments of scrap metal that were delivered to Jupiter but that Sabaitis knew would not be retained at Jupiter's facility or used for Jupiter's benefit;

      c.     receiving tickets created by Sabaitis for shipments of scrap metal that were delivered to Jupiter but that Sabaitis knew would not be retained at Jupiter's facility or used for Jupiter's benefit;

      d.     copies of P.O.'s that were submitted by Sabaitis for shipments of scrap metal that were delivered to Jupiter but that Sabaitis knew would not be retained at Jupiter's facility or used for Jupiter's benefit;

111.  Similarly, Jahn knowingly and intentionally made false and misleading representations to Jupiter when he approved payment and signed and mailed checks to vendors for scrap metal that

Jupiter received but that the Defendants caused to be removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

112.  Jupiter reasonably relied on Sabaitis's and Jahn's additional misrepresentations when it paid vendors for scrap that was received by Jupiter but later removed by Jupiter's facility by Defendants.

113.  Sabaitis's and Jahn's misrepresentations constitute fraud.

114.  Sabaitis's and Jahn's misrepresentations caused Jupiter to incur more than $8 million in losses by paying for:  (1) scrap metal that Jupiter never received, and (2) scrap metal that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against Sabaitis and Jahn on Count IV in an amount to be determined at trial, and for such other and further relief as this Court deems appropriate.

**COUNT V**
**Criminal Conversion**
**Violation of Indiana Code § 35-43-4-3(a)**
**(All Defendants)**

115.  Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

116.  Without any legal jurisdiction or right, each of the Defendants knowingly or intentionally exerted unauthorized control over Jupiter's property.  Specifically, each of the Defendants:

    a.    conspired to divert the 95 "ghost truck" shipments from Jupiter's facility and sell the scrap that rightfully belonged to Jupiter back to Jupiter or to other third parties for their own personal gain;

      b.      conspired to remove scrap that had been delivered to Jupiter and sell it back to Jupiter or to other third parties for their own personal gain.

117.  Each of the Defendants' wrongful retention of Jupiter's money and property constitutes a misappropriation in violation of Ind. Code § 35-43-4-3.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against each of the Defendants on Count V and provide the following relief to Jupiter:

      a.      General damages according to proof at trial, trebled according to statute, Ind. Code § 34-24-3-1

      b.      Jupiter's reasonable attorneys' fees and costs according to statute, Ind. Code § 34-24-3-1;

      c.      Actual travel expenses according to statute, Ind. Code § 34-24-3-1;

      d.      A reasonable amount to compensate Jupiter for time used to file papers and attend court proceedings according to statute, Ind. Code § 34-24-3-1;

      e.      Actual direct and indirect expenses incurred by Jupiter to compensate employees and agents for time used to attend court proceedings and travel to and from court according to statute, Ind. Code § 34-24-3-1;

      f.      All other reasonable costs of collection; and

      g.      Such other and further relief as this Court deems appropriate.

**COUNT VI**
**Deception**
**Ind. Code § 35-43-5-3(a)(2)**
**(All Defendants)**

118.  Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

119.   The Defendants knowingly and intentionally generated false documents with the intent to improperly obtain Jupiter's money and property.   That falsified documentation included, but is not limited to bills of lading, receiving tickets, P.O.s and checks related to:

    a.    the 95 "ghost truck" shipments that were diverted from Jupiter's facility by Defendants and sold back to Jupiter or to other third parties for the Defendants' own personal gain;

    b.    scrap that had been delivered to Jupiter and  removed by Defendants, who sold it back to Jupiter or to other third parties for their own personal gain.

120.   The Defendants' knowing, intentional and willful acts constitute deception under Ind. Code § 35-43-5-3(a)(2).

121.   Defendants' actions caused Jupiter to incur more than $8 million in losses by paying for: (1) scrap metal that Jupiter never received, and (2) scrap metal that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against each of the Defendants on Count VI and provide the following relief to Jupiter:

    a.    General damages according to proof at trial, trebled according to statute, Ind. Code § 34-24-3-1

    b.    Jupiter's reasonable attorneys' fees and costs according to statute, Ind. Code § 34-24-3-1;

    c.    Actual travel expenses according to statute, Ind. Code § 34-24-3-1;

    d.    A reasonable amount to compensate Jupiter for time used to file papers and attend court proceedings according to statute, Ind. Code § 34-24-3-1;

e.     Actual direct and indirect expenses incurred by Jupiter to compensate employees and agents for time used to attend court proceedings and travel to and from court according to statute, Ind. Code § 34-24-3-1;

f.     All other reasonable costs of collection; and

h.     Such other and further relief as this Court deems appropriate.

## COUNT VII
### Civil Conspiracy
### (All Defendants)

122.   Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

123.   Defendants acted in concert to accomplish an unlawful purpose, which constitutes a civil conspiracy.

124.   As a result of Defendants' conspiracy, Jupiter incurred more than $8 million in losses by paying for:  (1) scrap metal that Jupiter never received, and (2) scrap metal that Jupiter received but that was removed from Jupiter's facility before Jupiter processed it into recycled aluminum

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against each of the Defendants on Count VII in an amount to be determined at trial, and for such other and further relief as this Court deems appropriate.

## COUNT VIII
### Breach of Contract
### (SMS, GMI)

125.   Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

126.   GMI and SMS periodically agreed to ship scrap to Jupiter in exchange for payment by Jupiter for that scrap.  Each time such an agreement was reached, Jupiter mailed to GMI and SMS a P.O. that set forth the contractual terms that the parties were obligated to abide.

26

127.  Among other things, the P.O. required SMS and GMI to deliver the agreed-upon amount of scrap to Jupiter on or before the date designated for delivery.

128.  Between August 21, 2013 and March 14, 2014, SMS was paid a total of $507,566 for 26 shipments of scrap metal that were not, in fact, delivered to Jupiter.  Those 26 shipments corresponded to 22 separate P.O.s, each of which contained the identical contractual terms.  (*See* Ex. 1.)

129.  Between August 20, 2013 and October 23, 2013, GMI was paid a total of $55,148 for two shipments of scrap metal that were not, in fact, delivered to Jupiter.  Those two shipments corresponded to two separate P.O.s, each of which contained the identical contractual terms.  (*See* Ex. 1.)

130.  By failing to deliver the agreed-upon scrap metal to Jupiter, SMS and GMI materially breached their agreements with Jupiter.

131.  Jupiter complied with all of its obligations under its agreements with SMS and GMI, including making payment for scrap metal that was not, in fact, delivered to Jupiter.

132.  SMS's and GMI's actions render them liable to Jupiter for damages as a result of their respective breaches of the P.O. agreements.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against SMS and GMI on Count VIII in an amount to be determined at trial, and for such other and further relief as this Court deems appropriate.

**COUNT IX**
**Unjust Enrichment**
**(All Defendants)**

133.  Jupiter re-states and re-alleges paragraphs 1-77, as though fully set forth herein.

134.  To the detriment of Jupiter, each of the Defendants, through the acts and omissions described herein, procured and unjustly retained funds and property that are the rightful property of Jupiter.  Specifically, the Defendants:

      a.      conspired to divert the 95 "ghost truck" shipments from Jupiter's facility and sell the scrap that rightfully belonged to Jupiter back to Jupiter or to other third parties for their own personal gain;

      b.      conspired to use the dropped trailers to remove scrap that had been delivered to Jupiter and sell it back to Jupiter or to other third parties for their own personal gain.

135.  This money and property is a measurable benefit to Jupiter, to which the Defendants are not entitled.

136.  As a result of the Defendants' wrongful conduct, each of them has been unjustly enriched, and Jupiter has suffered a detriment.

137.  Jupiter is entitled to restitution and disgorgement from each of the Defendants of all amounts they have unjustly and wrongfully received and retained.

WHEREFORE, Jupiter respectfully requests that this Court enter judgment against each of the Defendants on Count IX in an amount to be determined at trial, and for such other and further relief as this Court deems appropriate.

## JURY DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Jupiter hereby demands a jury trial as to all issues of this suit.

Respectfully submitted,
Jupiter Aluminum Corporation, Plaintiff


By:＿＿＿/s/ Blake A. Roter＿＿＿＿＿＿＿＿＿
 One of its Attorneys


Stephen R. Meinertzhagen (*pro hac vice* anticipated)
Benjamin P. Wieck (*pro hac vice* anticipated)
Blake A. Roter
Joshua J. Cauhorn (*pro hac vice* anticipated)
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, 22nd Floor
Chicago, IL 60611-3607
312-840-7000
312-840-7900 fax