UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JUPITER ALUMINUM CORPORATION,    )
    )
        Plaintiff,    )
    )
vs.    )    Cause No. 2:16-cv-30
    )
PHILIP J. SABAITIS; LOREN D. JAHN; SCRAP )
METAL SERVICES, LLC; MICHAEL L.    )
THOMPSON; GMI SERVICES LLC D/B/A GMI )
RECYCLING SERVICES, INC.; and GARY S.    )
LONGORIA,    )
    )
        Defendants.    )

## OPINION AND ORDER

Something went very wrong at Jupiter Aluminum Corporation in fiscal year 2014. Jupiter is an Indiana corporation in the business of converting scrap aluminum into coils. It contracts with vendors to provide the scrap. Jupiter claims that a FY2014 audit revealed that Jupiter processed less scrap that year than it ordered, yet Jupiter still paid all of its vendors for the full amount ordered. The result was Jupiter paying for about eight million dollars in scrap that it never processed. Jupiter alleges that defendants conspired to submit falsified paperwork to cover up schemes to divert scrap that Jupiter ordered away from Jupiter and to make off with scrap that was already delivered to Jupiter.

Jupiter sued Philip Sabaitis, Jupiter's receiving/inventory supervisor from 2009-2015; Loren Jahn, Jupiter's CFO from 2007-2014; Scrap Metal Services (SMS), a scrap vendor, and Michael Thompson, senior manager and

partial owner of Scrap Metal Services; and GMI Recycling Services, another scrap vendor, and Gary Longoria, GMI's owner. Jupiter alleges federal and state RICO violations and violations of state law based on fraud, criminal conversion, deception, civil conspiracy, breach of contract and unjust enrichment. All defendants have moved to dismiss Jupiter's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

This court has jurisdiction under 18 U.S.C. § 1964, 28 U.S.C. § 1331, and 28 U.S.C. § 1367. For the reasons that follow, the court grants all of the motions to dismiss. With no surviving claims over which it has original jurisdiction, the court declines to exercise supplemental jurisdiction over the state law claims, 28 U.S.C. § 1367(c)(3), and dismisses the whole case.

## I.    JUPITER'S ALLEGATIONS

Jupiter describes the process it uses to acquire scrap from vendors. Jupiter first determines the price it's willing to pay for various types of scrap. Jupiter then emails vendors with information about the type and quantity of scrap it wants to buy and the price it's willing to pay. Once a vendor responds and the parties agree on the type, quantity, and price of the scrap to be delivered, Jupiter prepares a quote sheet containing a purchase order number. Jupiter emails the quote sheet to the vendor or provides its information over the phone. Jupiter enters the quote sheet information into its computer system, which prints a purchase order for each transaction detailing the vendor's name, type and quantity of scrap, price, date of delivery, and terms

and conditions of the transaction. Jupiter sends the original purchase order to the vendor while keeping a copy for its files. After a purchase order is issued, the vendor schedules a time for delivery.

Delivery trucks entering Jupiter's premises must first check in at a gate manned by SDG Global, an entity independent from Jupiter. SDG personnel record the names of the carrier and driver, and the times of the truck's arrival and departure. SDG's records don't include any information about the contents of the delivery. Once checked in, trucks proceed to Jupiter's receiving department. They drive onto a scale that weighs and records the full gross weight of the trailer, have the scrap unloaded by Jupiter employees, and then return to the scale so the trailer's empty weight can be recorded. Jupiter issues a receiving ticket showing the weights of the full and the empty trailer, a description, the net weight of the scrap delivered, the purchase order number, and the vendor's name. Drivers typically provide Jupiter with a bill of lading from the vendor showing the type and quantity of the scrap that was on the trailer when it left the carrier's facility. At all times relevant to this action, Philip Sabaitis signed bills of lading acknowledging Jupiter's receipt of shipments.

Jupiter says it issues payments to vendors based on transaction packets prepared by Mr. Sabaitis. Each packet includes a copy of the purchase order, the receiving ticket, and the signed bill of lading, and is submitted to Jupiter's scrap purchasing department, which approves payment to the vendor. Jupiter

then issues a check, CFO Loren Jahn signs the check, and Jupiter mails the check to the vendor within 30 days of the date of the delivery.

Jupiter reports that in FY2014, it discovered an inventory shortfall: the company had paid over $8 million for inventory it didn't receive or process. Jupiter faults the defendants for that shortfall, alleging that Philip Sabaitis and Loren Jahn "surreptitiously conspired over a substantial period of time" with Scrap Metal Services and its senior manager, Michael Thompson; and GMI Services and its owner, Gary Longoria; to submit falsified paperwork that caused Jupiter to pay for scrap shipments the company never received and scrap shipments that were received by the company but removed from Jupiter's facility before being processed. Jupiter claims the defendants undertook two schemes to defraud the company.

First is the "ghost truck" scheme, in which the defendants caused Jupiter to pay for scrap shipments the company never received. Jupiter says that during its investigation of the inventory shortfall, it acquired SDG Global's guard gate logs and found "numerous instances where a vendor was paid for a 'shipment' but the guard gate log didn't reflect a corresponding truck entering Jupiter's facility." Jupiter says it then contacted its vendors seeking information to help reconcile these "ghost truck" shipments. Jupiter reports that some vendors responded with all the requested information, some with some of the information, some refused to provide any information, and some didn't respond at all. Jupiter reports that while it could reconcile some of those shipments, "95 trucks from 20 different vendors are unreconciled on SDG's

guard gate logs; that is, these 95 'ghost trucks' never arrived at Jupiter's facility," resulting in Jupiter paying about $2.48 million for scrap it never received. Jupiter claims that bills of lading "for almost all of the 'ghost trucks'" were signed by Mr. Sabaitis, who Jupiter alleges to have conspired with the other defendants "to divert the 'ghost truck' shipments and sell the scrap back to Jupiter or to third parties for their own personal gain."

Jupiter alleges a second, "scrap removal" scheme to account for the remaining $5.5 million in missing inventory. This scam was part of a conspiracy by the defendants to remove unprocessed scrap from Jupiter's premises and then to sell that scrap back to Jupiter or to third parties for the defendants' own personal gain. Jupiter offers possible scenarios the defendants could have employed to facilitate the scheme.

Jupiter alleges that Messrs. Sabaitis and Jahn agreed to and knowingly conducted and participated in those schemes to intentionally defraud Jupiter. Jupiter claims they used wire services and the United States Postal Service to execute their fraud against Jupiter, causing Jupiter to pay more than $8 million for scrap metal it never received and scrap metal that was taken from Jupiter before being processed. Jupiter maintains that Messrs. Sabaitis and Jahn's use of wire and mail services to carry out the fraud constituted a pattern of racketeering activity under 18 U.S.C. § 1961(5).

Jupiter alleges that all six defendants knowingly and intentionally agreed and conspired to participate in the affairs of Jupiter through a pattern of racketeering. Jupiter says the defendants knew the acts of wire and mail fraud

were part of the pattern of racketeering activity, they agreed to the commission of those acts to further the "ghost truck" and "scrap removal" schemes, and they knowingly and intentionally acquired or maintained proceeds belonging to Jupiter through the pattern of racketeering, causing Jupiter to pay more than $8 million for scrap metal it never received and scrap that was diverted from Jupiter before the company was able to process it into coils.

Jupiter filed suit, alleging a federal RICO claim against defendants Messrs. Sabaitis and Jahn, 18 U.S.C. § 1962(c) [Count 1]; a RICO conspiracy claim against all defendants, 18 U.S.C. § 1962(d) [Count 2]; a RICO claim under Indiana law, IND. CODE § 35-45-6-2 [Count 3], and a common law fraud claim [Count 4] against defendants Sabaitis and Jahn; claims for criminal conversion, Ind. Code § 35-43-4-3(a) [Count 5], deception, Ind. Code § 35-42-5-3(a)(2) [Count 6], civil conspiracy [Count 7], and unjust enrichment [Count 9] against all defendants; and a breach of contract claim [Count 8] against defendants Scrap Metal Services, LLC and GMI Recycling Services, Inc. Each of the defendants filed a motion to dismiss Jupiter's claims against them for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint that fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the complaint typically must meet the "notice pleading" requirement of Federal Rule of Civil Procedure 8(a), that the

complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," so the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A court considering a motion under Rule 12(b)(6) must accept as true the factual allegations of the complaint and draw all reasonable inferences in favor of the plaintiff without engaging in fact-finding. Reynolds v. CB Sports Bar, Inc., 623 F.3d 1143, 1146 (7th Cir. 2010). Detailed factual allegations aren't necessary, but merely reciting the elements of a cause of action isn't sufficient. The factual allegations must be sufficient to raise the possibility of relief above the "speculative level." Bell Atlantic v. Twombly, 550 U.S. at 555. The plaintiff must allege facts that, when "accepted as true, [ ] 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A plaintiff's claim need not be probable, only plausible, but "a plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to her that *might* be redressed by the law." Swanson v. Citibank, N.A., 614 F.3d 400, 403 (7th Cir. 2010) (emphasis in original).

When claiming fraud, a plaintiff must state the circumstances "with particularity." Fed. R. Civ. P. 9(b). Allegations of fraud in a civil RICO complaint are subject to the heightened pleading standard of Rule 9(b). "The particularity

requirement ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations." <u>Perelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.</u>, 631 F.3d 436, 439 (7th Cir. 2011); <u>Borsellino v. Goldman Sachs Group, Inc.</u>, 477 F.3d 502, 507 (7th Cir. 2007) ("This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do."). "Because fair notice is perhaps the most basic consideration underlying Rule 9(b), the plaintiff who pleads fraud must reasonably notify the defendants of their purported role in the scheme." <u>Vicom, Inc. v. Harbridge Merchant Servs., Inc.</u>, 20 F.3d 771, 777 (7th Cir. 1994) (internal citations and quotations omitted). Thus, Rule 9(b) requires a plaintiff alleging fraud to plead the "who, what, when, where, and how of the fraud." <u>Camasta v. Joseph A. Bank Clothiers, Inc.</u>, 761 F.3d 732, 737 (7th Cir. 2014).

The applicability of Rules 8(a) and 9(b) to the claims of Jupiter's complaint is at issue in each defendant's motion to dismiss. The court of appeals hasn't decided whether the heightened standard of Rule 9(b) applies to each element of a fraud-based RICO claim or only to the underlying fraud allegations. <u>Kostovetsky v. Ambit Energy Holdings, LLC</u>, 15 C 2553, 2016 WL 105980, at *3 (N.D. Ill. Jan. 8, 2016). Jupiter argues that its allegations of mail and wire fraud are only applicable to the § 1962(c) defendants and that the heightened pleading standard only applies to the predicate acts themselves, not the other elements of the § 1962(c) claim. The court will apply the requirement of Rule 9(b) to Jupiter's claims of mail and wire fraud and the requirements of

Rule 8(a) to the remaining claims. The complaint doesn't survive the motions to dismiss even under this looser approach, and so it also wouldn't survive if all elements required the scrutiny of Rule 9(b).

## III.   DISCUSSION

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debts." 18 U.S.C. § 1962(c). Jupiter must allege facts that satisfy four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" for its § 1962(c) claim against Messrs. Sabaitis and Jahn to survive. Jennings v. Auto Meter Prods., Inc., 495 F.3d 466, 472 (7th Cir. 2007). Jupiter doesn't allege facts against Mr. Sabaitis that plausibly meet the "conduct" element of the claim nor does it allege facts against Messrs. Sabaitis and Jahn that plausibly support the "racketeering activity" element and so the § 1962(c) claims are dismissed. Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection . . . (c)." 18 U.S.C. § 1962(d). Jupiter also doesn't allege a plausible conspiracy under § 1962(d) and so its § 1962(d) claims are dismissed.

### A.   "Enterprise"

The first issue is whether Jupiter, simply by alleging that Jupiter is a privately-held Indiana corporation, has sufficiently alleged an "enterprise" as

used in § 1962(c) and defined in § 1961(4). Underlying this issue is whether, under § 1962(c), the "enterprise" can be the victim of a pattern of racketeering activities or can only be the vehicle through which the pattern is carried out. The enterprise can be both vehicle and victim, and so Jupiter has sufficiently pleaded facts to establish an "enterprise."

An "enterprise" "includes any . . . corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Jupiter is a "corporation" and so is included under the plain text of the definition.

The defendants argue that an "enterprise" under subsection (c) can't be the victim of a pattern of racketeering but can only be the vehicle through which that pattern is carried out. The court of appeals has held that an enterprise may be the victim of a pattern of racketeering. <u>United States v. Kovic</u>, 684 F.2d 512, 516-517 (7th Cir. 1982) ("The not-very-surprising corollary to the premise that an enterprise need not be benefitted by a pattern of racketeering activity to come under RICO is that the enterprise may in fact be harmed by the illegal activity."). Later precedent from the Supreme Court and the Seventh Circuit doesn't disturb this holding and assumes that an "enterprise" may be either vehicle or victim. "Enterprise," as used in § 1962(c) "connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." <u>National Organization for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 250 (1994). The court of appeals also describes the typical enterprise as the vehicle for

10

corruption. *See* <u>Jennings v. Emry</u>, 910 F.2d 1434, 1440 (1990) ("[A]lthough a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise . . . ."). Neither court, though, held that the enterprise must be the victim, and other § 1962(c) cases assumes that the enterprise can serve either function. *See* <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 164 (2001) ("The Court has held that RICO both protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it, *United States v. Turkette*, 452 U.S. 576, 591 . . . (1981), and also protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful activity is committed,' [<u>NOW</u>, 510 U.S. at 259]."); <u>United States v. Warner</u>, 498 F.3d 666, 696 (7th Cir. 2007) (allowing a state to act as both enterprise and victim in a RICO prosecution). None of this precedent disturbs the holding of <u>Kovic</u> that a § 1962(c) enterprise may be the victim of a pattern of racketeering. *See* <u>LaSalle Bank Lake View v. Seguban</u>, 937 F. Supp. 1309, 1322-1323 (N.D. Ill. 1996) (determining that <u>Kovic</u>'s holding remains intact after the <u>NOW</u> decision). Jupiter, as an Indiana corporation, thus falls within the definition of an "enterprise" as used under § 1962(c).[1]

---

[1] The defendants conflate distinctness between "person" and "enterprise" under § 1962 with the role that each party plays in the RICO formula (i.e., whether the enterprise is the vehicle for the pattern of racketeering or the victim of it). Distinctness only requires that the "person" and the "enterprise" are separate entities. *See* <u>McCullough v. Suter</u>, 757 F.2d 142, 144 (7th Cir. 1985) (holding that § 1962 requires distinctness because "you cannot associate with yourself"); GREGORY P. JOSEPH, CIVIL RICO: A DEFINITIVE GUIDE 68 (3rd ed. 2010) ("The 'person' who allegedly violates section 1962(c) must be distinct from the 'enterprise' whose affairs that person is allegedly 'conduct[ing] or participat[ing]' in conducting.'"). A legally formal difference between the entities is all that is needed. <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S.

## B. "Conduct or participate"

To prevail on the § 1962(c) claims, Jupiter must allege that Messrs. Sabaitis and Jahn "conduct[ed] or participate[d], directly or indirectly, in the conduct of" Jupiter's affairs. 18 U.S.C. § 1962(c). "[I]n order to satisfy the 'conduct' element of § 1962(c), a plaintiff must allege that the defendant participated in the operation or management of the enterprise itself, and that the defendant played some part in directing the enterprise's affairs." Goren v. New Vision Int'l, Inc., 156 F.3d 721, 727 (7th Cir. 1998) (internal quotations and citations omitted). The word "conduct" "indicates some degree of direction." Reves v. Ernst & Young, 507 U.S. 170, 178 (1993). To participate in the conduct of Jupiter's affairs, the defendants "must have some part in directing" Jupiter's affairs. Id. at 179. Goren and Reves don't require that a § 1962(c) violator be part of the enterprise's upper management. The rule includes "lower-rung participants in the enterprise who are under the direction of upper management or others associated with the enterprise who exert control over it, as for example, by bribery." MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 977 (7th Cir. 1995) (internal quotations omitted).

Jupiter doesn't allege facts demonstrating that Mr. Sabaitis is upper management or that he is "under the direction of upper management or others associated with the enterprise who exert control over it." Id. Jupiter alleges that Mr. Sabaitis acted as the Receiving/Inventory Supervisor, and that he had

---

158, 163 (holding that a sole proprietor was distinct enough from his company that the former could be the "person" and the latter the "enterprise"). Distinctness is not at issue here.

"supervisory authority over receiving and documenting incoming shipments." These allegations are insufficient to state a plausible claim that Mr. Sabaitis participated in the operation or management of the enterprise. Nothing in the pleadings about Mr. Sabaitis's title or activities at Jupiter indicates that he directly participated in the operation or management of Jupiter. Jupiter alleges no facts that create a chain of command such that the alleged racketeering was done at the direction of someone at the level of Jupiter's operation or management. The facts alleged don't create a plausible inference that the man who oversees shipments that come in and out participates in the operation or management of Jupiter as a whole. With only the facts in the complaint, there is no allegation of conduct, so Mr. Sabaitis's motion to dismiss must be granted on Count I.

The same can't be said for Mr. Jahn. That Mr. Jahn is Jupiter's chief financial officer automatically places him in a position of responsibility over the financial risks of the corporation. This complaint at least raises a plausible inference that Mr. Jahn is part of the operation or management of Jupiter.

C.     "Pattern"

The "ghost truck" and "scrap removal" schemes, if true, would constitute a "pattern of racketeering activity." The statute explains that a "pattern of racketeering activity" requires at least two acts of racketeering within ten years. 18 U.S.C. § 1961(5). In addition, a plaintiff must allege facts that demonstrate "continuity plus relationship" between the acts of racketeering. <u>Gagan v. Am. Cablevision, Inc.</u>, 77 F.3d 951, 962 (7th Cir. 1996). Four factors demonstrate a

pattern of racketeering activity: "(1) the number and variety of the predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries." *Id.* at 962-963.

This isn't an alleged instance of offenders absconding once with a pile of scrap after arranging by phone or email to have Jupiter pay for more than it ultimately receives. If Jupiter's allegations are true, this is a situation of offenders coordinating to regularly represent to Jupiter the amount of scrap that it was buying and receiving over a period of at least ten months. The ten month period is enough for a closed-ended pattern. *Id.* at 963 (analyzing <u>Liquid Air Corp. v. Rogers</u>, 834 F.2d 1297, 1300 (7th Cir. 1987), where a single scheme which lasted seven months and defrauded one victim established a pattern of racketeering because "each instance of false billing inflicted an injury separate and independent of the previous and succeeding instances of false billing."). Jupiter alleges numerous instances of intentional false billing for scrap that was either never delivered or was stolen after delivery over an extended period. This is enough for a closed-ended pattern.

> D. Whether Messrs. Sabaitis and Jahn acted "through" a pattern of racketeering activities.

Even if Jupiter effectively pleaded the "conduct" element of the claim against Mr. Sabaitis, Jupiter doesn't allege facts that state a plausible claim for relief against either Mr. Sabaitis or Mr. Jahn. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). Jupiter is incorrect that the kind of claim and the scale of discovery involved has no

bearing on whether the claim is plausible. <u>Twombly</u> "teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." <u>Limestone Dev. Corp. v. Vill. of Lemont</u>, 520 F.3d 797, 802-803 (7th Cir. 2008). "RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim." <u>Id.</u> at 803. Even when evaluated under the basic notice pleading standard of Rule 8(a), "the pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action." 5 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS, A. BENJAMIN SPENCER & ADAM N. STEINMAN, FEDERAL PRACTICE AND PROCEDURE § 1216 (3d ed. 2016).

Rule 9(b) further requires that because Jupiter alleges wire and mail fraud, 18 U.S.C. §§ 1341, 1343, Jupiter plead the "who, what, when, where, and how of the fraud." <u>Camasta v. Joseph A. Bank Clothiers, Inc.</u>, 761 F.3d 732, 737 (7th Cir. 2014). "[T]he plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." <u>Jepson, Inc. v. Makita Corp.</u>, 34 F.3d 1321, 1328 (7th Cir. 1994).

Despite <u>Jepson</u>'s statement of what is needed in mail/wire fraud pleadings, such particularity in the contents of the emails is not needed for Jupiter's claim to survive here. Jupiter appropriately alleged the contents to contain information about the price and quantity of the scrap being purchased.

Ultimately this case is about what happened to $8 million in scrap metal, with Jupiter alleging that Messrs. Jahn and Sabaitis engaged in acts of wire and mail fraud to hide the fact that they arranged for this scrap to be redirected from Jupiter or taken from Jupiter after delivery. Even if Jupiter alleged the precise contents of the emails associated with "ghost truck" and "scrap removal" purchases, this would tell the court nothing about the fraud. It wasn't the emails that were doctored to misrepresent what was purchased, it was the product itself that was allegedly diverted beneath those emails.

Still, the complaint doesn't allege enough facts to make the fraudulent scheme plausible or to plausibly connect Messrs. Sabaitis and Jahn to it. A plausible claim for relief ought to allege facts that indicate why the particular defendants in the case used fraudulent means of communication to bill Jupiter for that scrap. Certain alleged facts still leave open the glaring possibility that others were responsible for the alleged theft or that much (if not all) of it can be attributed to recordkeeping problems. Few facts tie any of the defendants to the loss.

The primary example of the paucity of alleged facts is the spreadsheet that Jupiter uses to support its "ghost truck" scheme. The spreadsheet lists twenty different vendors linked to alleged ghost trucks. For either Mr. Sabaitis or Mr. Jahn to be responsible for the ghost trucks, one or both of them would have had to convince each of the twenty vendors to accept payment for goods that weren't going to be delivered. Yet the complaint contains no indication of any such communications with any of them, not even the named defendants

16

GMI and SMS. For the scheme to work, all twenty vendors would have had to be involved or, if the vendor doesn't provide the trucking services, the trucking company would need to be involved.

Jupiter doesn't discuss any of the vendors on the spreadsheet except for defendants GMI and SMS. Yet the vendor with the largest amount of "ghost truck" scrap is Metal Exchange Corp. Was this company in on the racket too? If not, then how does Jupiter explain this vendor's roughly $700,000 in ghost truck scrap? No facts are alleged to suggest that Messrs. Sabaitis or Jahn coordinated with the company associated with the largest amount of "ghost truck" losses. The value of scrap lost through GMI's ghost trucks was a mere $55,148 out of the $2.48 million allegedly lost through ghost trucks overall. Ten of the twenty ghost truck vendors had ghost truck scrap more valuable than GMI's. Where was the coordination with them? How could someone relying only the complaint know the "ghost trucks" aren't just a matter of poor reporting on the part of the gate attendants?

Lack of contradiction between allegations places the claim into the realm of possibility, but it doesn't make the claim plausible: "a plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to her that *might* be redressed by the law." Swanson v. Citibank, N.A., 614 F.3d 400, 403 (7th Cir. 2010). Jupiter alleges facts that are consistent with a wide-scale coordination by Messrs. Sabaitis and Jahn with all of the ghost truck vendors, but leaves

out glaring details that would elevate these allegations beyond hunch or suspicion.

Even more tenuous is the "scrap removal" scheme, which supposedly accounts for the vast majority of the lost money. There is no explanation for how we know the value of scrap lost through this possible scheme, though, except that Jupiter subtracted out the amount it attributed to ghost trucks from the overall amount missing and simply assumed the rest was stolen. There is no indication from the facts that Mr. Sabaitis implemented one of the possible strategies described to unload trailers-full of scrap. There are other good explanations for why Mr. Sabaitis would allow SMS to leave their trailers at the facility, such as that it was more convenient for SMS, a large scrap vendor for Jupiter. A nefarious relationship between Mr. Sabaitis and SMS wouldn't explain all of the parties who would have had to be involved in order for this scam to work. The complaint alleges no facts with respect to Mr. Jahn's coordination in this operation besides signing the checks.

Jupiter alleges some suspicious behavior: SMS drivers sometimes would turn around before entering the facility when Mr. Sabaitis wasn't present when the truck arrived; Mr. Sabaitis sometimes would leave out the weight and descriptions of scrap on bills of lading for SMS' shipments; Mr. Sabatis sometimes wouldn't submit receiving tickets describing how much scrap, if any, was delivered. There is a plausible claim that something odd was going on with Mr. Sabaitis, and even a plausible claim that something odd was going on with SMS. It doesn't follow from oddity that trucks from twenty different

companies were delivering scrap on paper but not doing so in reality. Oddity alone won't support a RICO claim.[2]

To proceed on this 'big' litigation, <u>Limestone Dev. Corp. v. Vill. of Lemont</u>, 520 F.3d 797, 803 (7th Cir. 2008), Jupiter must provide dots that outline the shape of what occurred before asking the court to connect them.

E.     The conspiracy claims.

Under 18 U.S.C. § 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To allege a RICO conspiracy claim, Jupiter must (1) identify a proper enterprise; (2) identify the defendant's association with that enterprise; and (3) allege that the defendant knowingly joined a conspiracy, the objective of which was to operate that enterprise through a pattern of racketeering activity. <u>United States v. Tello</u>, 687 F.3d 785, 794 (7th Cir. 2012). "A conspiracy to violate RICO may be shown by proof that the defendant, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." <u>DeGuelle v. Camilli</u>, 664 F.3d 192, 204 (7th Cir. 2011). A defendant need not personally commit a predicate act, but the plaintiff must allege that the defendant agreed that someone would commit two or more predicate acts. *Id.* The "touchstone of liability" "is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Id.*

---

[2] Jupiter also alleges some completely innocuous behavior. For example, that GMI only began selling scrap to Jupiter in FY 2011 and that, by FY 2014, it was Jupiter's second-largest scrap vendor by volume, hints at no wrongdoing of any kind.

The complaint contains insufficient facts from which an inference could be drawn that GMI or Gary Longoria entered into an agreement to defraud Jupiter. The allegations relating to GMI and Mr. Longoria are that (i) Jupiter believes Mr. Longoria was a childhood friend of Mr. Sabaitis; (ii) "on information and belief," GMI isn't in the business of purchasing or selling scrap metal, but from 2011–2014, GMI sold scrap to Jupiter and by 2014 was Jupiter's second largest scrap vendor by volume; (iii) in October 2014, GMI "abruptly" stopped delivering scrap to Jupiter at about the same time that Jupiter questioned Mr. Sabaitis about Jupiter's inventory shortfall; (iv) Jupiter has an open purchase order for scrap that GMI never completed, and Gary Longoria "falsely claimed" that GMI sold that scrap metal to another company; (v) GMI provided Jupiter with information about the carriers and drivers of its shipments, but GMI "was paid for two 'ghost shipments' . . . that do not appear on SDG's guard gate logs"; and (vi)"on information and belief," GMI and Mr. Longoria conspired with the other defendants to effectuate the "ghost truck" scam and the "scrap removal" scam for their own personal gain. None of those allegations supports an inference that GMI or Mr. Longoria agreed to enter into a conspiracy with the other defendants or agreed to the commission of predicate acts by Messrs. Sabaitis and Jahn in furtherance of that conspiracy.

Jupiter alleges that SMS, too, conspired in support of the pattern of racketeering activity. Jupiter alleges that, (i) instead of delivering scrap, SMS drivers would sometimes "turn around before entering Jupiter's facility" if they did not see Mr. Sabaitis there"; (ii) Mr. Sabaitis filled out bills of lading for SMS

shipments that often lacked the weight and a description of the scrap delivered; (iii) "SMS was paid for the weights indicated on Jupiter's receiving ticket, which is peculiar because a vendor typically would not choose to rely solely on the buyer's weight records without having its own record on its bill of lading"; (iv) some of SMS' shipments "did not have corresponding receiving tickets at all," and Mr. Sabaitis just submitted internal paperwork based on the purchase order and the bill of lading, resulting in SMS being paid based on how much scrap was ordered without record of how much was delivered; (v) Mr. Sabaitis allowed SMS to drop off trailers at Jupiter's premises for later unweighing and unloading, creating an opportunity to use those trailers to steal scrap from Jupiter; and (vi) during investigation of the missing scrap, SMS refused to make its drivers available for questioning or to allow Jupiter to copy certain records.

There is no plausible inference here that SMS joined a conspiracy to pilfer scrap belonging to Jupiter. "The Rules of Civil Procedure set up a system of notice pleading. Each defendant is entitled to know what he or she did that is asserted to be wrongful. . . . Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope." Bank of America, N.A. v. Knight, 725 F.3d 815, 818 (7th Cir. 2013). Some of the behavior alleged might be odd or even suspicious, but more is needed than allegations showing opportunity and curious behavior to create a plausible

inference that SMS coordinated with Messrs. Sabaitis and Jahn, not to mention its competitor GMI, to conduct the alleged schemes.

The conspiracy claims against Messrs. Longorias and Thompson are premised on the plausibility of the conspiracies of GMI and SMS respectively, and so these too are insufficiently pleaded.

CONCLUSION

Based on the foregoing, the court:

(1) GRANTS the motion to dismiss of Gary Longoria and GMI Services, LLC [Doc. No. 46];

(2) GRANTS the motion to dismiss of Scrap Metal Services, LLC [Doc. No. 32];

(3) GRANTS the motion to dismiss of Michael Thompson [Doc. No. 20];

(4) GRANTS the motion to dismiss of Philip Sabaitis [Doc. No. 48]; and

(5) GRANTS the motion to dismiss of Loren Jahn [Doc. No. 44].

The court has dismissed all claims over which it has original jurisdiction, and so it declines to exercise supplemental jurisdiction over the state law claims, 28 U.S.C. § 1367(c)(3), and so the case is DISMISSED.

A dismissal under Rule 12(b)(6) ordinarily is with prejudice. The court affords Jupiter 21 days from the date of this order in which to file an amended complaint. If Jupiter doesn't do so, judgment of dismissal with prejudice will be entered.

SO ORDERED.

ENTERED:  September 13, 2016

 /s/ Robert L. Miller, Jr.
Judge
United States District Court